UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROLAND HARTER, | Case No. 2:16-cv-00546-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| BONNER COUNTY, IDAHO, a political subdivision of the State of Idaho, | |
| Defendant. | |

## I. OVERVIEW

This matter comes before the Court on Defendant Bonner County's ("the County")

Motion for Summary Judgment. Dkt. 29. Plaintiff Roland Harter ("Harter") claims the

County unlawfully demoted him because of his age, and later fired him in retaliation for

filing a discrimination claim with the Idaho Human Rights Commission. He also alleges

violations of state contract law, and denial of his due process rights under 42 U.S.C.

§1983. The Court heard oral argument on this motion on August 21, 2018.

For the reasons set forth below, the Court GRANTS in PART and DENIES in

PART the County's Motion for Summary Judgment.

## II. FACTS

The County hired Harter in 1998 to work as an equipment operator in their Solid Waste Department. He was 49 years old at the time. The County quickly promoted Harter, and he ultimately supervised operations at its solid waste sites, which included supervisory responsibility over approximately 18 employees. Throughout Harter's employment, his supervisors periodically completed Performance Evaluations regarding his work. As early as 2001, one such evaluation noted that Harter "lets his personal likes and dislikes influence the way he deals with employees," and alleged that he showed preferential treatment to employees that he felt were easier to manage. Dkt. 29-33, at 3.

Between 2005 and 2015, Leslie Marshall served as Director of the County's Solid Waste Department, and as Harter's immediate supervisor. Their relationship was initially positive, as were her initial Performance Evaluations of Harter's work. However, their relationship began to deteriorate in 2012 after Marshall hired Lacey Blackford—a man approximately 30 years younger than Harter—to work alongside him.

Harter and Blackford immediately "butted heads." Dkt. 37-1, at 2-3. Marshall met with Harter on multiple occasions to discuss his growing tension with Blackford. Marshall's 2014 Performance Evaluation of Harter stated that he needed to improve the way he talked about other employees, and noted it is "unprofessional for [Harter] to continually bad mouth [his] supervisor to other employees." Dkt. 29-11, at 7; Dkt. 29-33, at 3. Harter responded to this evaluation, claiming Marshall's comments stemmed from hearsay rather than personal observations. Dkt. 11, at 7.

Harter proceeded to file a formal grievance with the County's Board of Commissioners regarding Blackford and Marshall. He claimed Blackford regularly attempted to antagonize him, and Marshall allowed Blackford's behavior to continue, while "becoming hostile towards [Harter] and dismissing [his] complaints as 'pissy.'" Dkt. 29-17. Harter was also frustrated because, following Blackford's hire, his opportunities to work overtime were "cut to zero." Dkt. 29-17, at 2; Dkt. 29-18, at 7-8, 27-28. Marshall responded with a letter stating Harter had "a history of letting [his] personal feelings towards an employee cloud [his] ability to professionally perform [his] job." Dkt. 29-33, at 3. She further claimed that Blackford was a good employee, and that Harter's complaints were not supported by documented evidence. Dkt. 29-18, at 6-9.

On February 20, 2014, the Board of County Commissioners held a meeting to discuss Harter's grievance. Both Harter and Marshall were present. Harter elaborated on his grievance letter and alleged that the County hired Blackford "because of [Harter's] age" and because Marshall intended for Blackford to eventually replace Harter. Dkt. 29-18, at 31. Marshall admitted to telling Harter that she "brought someone on to learn his job . . . because there could be a time when [Harter] will need to be replaced and [she] need[ed] to have someone understand [Harter's responsibilities]." *Id.* at 32. She clarified that in making these comments, it was not in reference to Harter potentially being fired, but merely a reference to Harter eventually retiring.

On February 20, 2014, the County Commissioners sent Harter notice of its decision regarding his grievance. The Commissioners disagreed with Marshall that Harter's claims were frivolous. However, while they found his complaints to be serious,

they also found them to be "unsubstantiated and therefore unprovable." Dkt. 29-19. As such, the County took no further action.

Marshall retired from her position in April of 2015. She provided the County with notice several months prior to her departure, during which time the County advertised the upcoming vacancy. Harter claims the County never provided him with personal notice regarding an opportunity to apply for the position. Harter did, however, have notice of Marshall's impending retirement because she sent a personal email informing her co-workers of her decision. Dkt. 29-11, at 20. Harter did not apply for the position because he assumed the County had already selected a man named Bob Howard to serve as Marshall's replacement. Specifically, Harter explained:

> I wasn't sure that [Marshall's position] was going to be available to somebody other than Bob Howard, because Bob Howard had spent a certain amount of time with [Marshall], and I just . . . assumed that . . . [the County] had been sort of preparing him for that position. But it turns out, he was not. They advertised the job and didn't let anybody know, or at least they didn't let me know that there was an opportunity for me to apply for it.

*Id.*

Harter never discussed whether he could apply for the position with Marshall, the County's Human Resources office, or Bob Howard. *Id.* Ultimately, the County hired Matt Klingler to fill Marshall's role. At the time of this hiring, Klinger was fifty-one years old, and Harter was sixty-six.

Shortly after taking over as Director, Klingler split the County's Solid Waste Department into two divisions, referred to as "Eastside" and "Westside." Klingler assigned a man named Kevin Reynolds, who was fifty-three years old at the time, to

oversee operations on the Eastside, and Harter was assigned to oversee operations on the Westside. Klingler claims that this decision was made for "purely managerial purposes." Dkt. 29-21. Harter claims the split was an age-based demotion, as Reynolds was younger than him, and Harter—who previously supervised all the County's Solid Waste sites— now only supervised half.  He raised these concerns with Cindy Binkered, the County's Human Resources Director, and requested a hearing. Binkered informed Harter that, pursuant to the County's Policy and Procedure Manual, Harter was not entitled to a hearing because he was not actually demoted, nor was his salary reduced.

Within his first two months as Director, Klingler received complaints about Harter from three separate employees. One such complaint claimed Harter "has a history of trying to intimidate people who he decides he does not want working under him any longer. In the past I have seen and heard about him mentaly [sic] bulling [sic] and intimidating [various co-workers]." Dkt. 29-23. The complaint further alleged that Harter made demands that "were unsafe, but he INSISTED that we follow his orders or he would find someone that would. He threatened to move us to different sites, etc." *Id.* (emphasis in original). Another complaint accused Harter of yelling at employees. Klingler reported these complaints to Binkered, who requested that Bill Wilson, an attorney in the County's Prosecutor's Office, investigate the allegations and report his findings to the County Commissioners.

Wilson's investigation began on June 8, 2015. He interviewed five individuals prior to interviewing Harter. These interviews revealed multiple allegations of Harter using scheduling as a weapon against his subordinates, screaming, and retaliating against

co-workers that upset him. Dkt. 29-12, at 1-5. One interviewee claimed she ultimately

resigned because Harter's treatment of her "became unbearable." *Id.* at 2-3. She

explained that she was afraid of Harter and dreaded going to work with him. *Id.*

On June 24, 2015, Wilson interviewed Harter to give him an opportunity to respond to

the allegations. When asked about a specific allegation of yelling at Kevin Reynolds,

Harter responded that "what [Reynolds] is referring to as 'screaming' started with him

because he went off about how I was accusing him of things . . . the decibels went up a

little bit, but there was no screaming and there was no hostility as far as I am concerned."

Dkt. 39-1, at 7, 9.

Harter admitted to using profanity during an argument with Blackford, explaining

that "guys at work, that's how they talk a lot of times." Dkt. 39-1, at 4. However, he

denied using scheduling as a weapon against his co-workers, or ever bullying them.

Finally, Wilson asked Harter to suggest individuals that he could "speak to on [Harter's]

behalf." Dkt. 39-1, at 4. Harter responded "I'll just blanket everybody. Everybody that

has worked for me right now. . . . I'm not going to eliminate anybody." *Id.* at 5. Wilson

explained that he did not want to interview everybody that had ever worked for Harter.

Specifically, he stated:

> [J]ust selfishly, I don't want to interview a dozen people. I would rather limit
> it to a couple because I have not interviewed that many people challenging
> you either. . . in fairness, if there are people who are going to be accusing
> you of things, I want you to have the opportunity to say 'no, this person is in
> the same position and they think I am doing a good job.' So a couple . . . of
> those people.

Dkt. 39-1, at 6. Harter then suggested four individuals Wilson could interview. Wilson, however, only interviewed one of them. *See* Dkt. 29-12, at 2-5; Dkt. 39-1, at 6.

At the end of his investigation, Wilson provided a summary and recommendation to the County. While Wilson did not consider every allegation made against Harter to be credible, he found many of the allegations—made by different employees and arising from various interactions spanning over a decade—to be credible and "remarkably similar." Dkt. 29-12, at 6. He recommended placing Harter on a one-year probation.

Binkerd and Klingler discussed the results of the investigation with the County Commissioners. Finding the results to be credible, the County demoted Harter to the role of Solid Waste Technician, without a reduction in pay, on July 21, 2015. The County also placed Harter on a one-year probation. The County claims that, pursuant to this probation, Harter's employment status was changed from "for-cause" to "at-will." Harter claims that he was never made aware of this change and argues that he remained a for-cause employee.

Following this demotion, Harter sought to appeal the decision. After sending Binkerd multiple emails seeking information regarding the proper procedures for initiating an appeal, she responded with a letter that said:

> Consistent with the policy guidelines, because there was no change to your pay, you were kept whole in regard to benefits, there are no appeal rights. The opportunity to be heard and name clearing relates to those employees who are independent contractors, seasonal, temporary or probationary. None of which you are. Therefore, your request for an appeal hearing is denied on that basis.

Dkt. 29-29, at 1.

Harter then filed a complaint with the Idaho Human Rights Commission ("IHRC"). Specifically, he alleged that the County discriminated against him based on his age when it reassigned half of his supervisory responsibilities to a younger employee (Kevin Reynolds), and again when it demoted him and placed him on probation following Wilson's investigation. Additionally, Harter alleged that in 2014 the County engaged in age-based discrimination when it hired Kevin Reynolds to be the "alternative emergency response manager" without giving Harter an opportunity to apply for the position.

On July 14, 2016, while Harter's IHRC complaint was still pending, he received a notice of termination from the County. The notice did not specifically explain why the County was terminating him. It simply stated that the County was "unsatisfied with [his] performance." Dkt. 29-14, at 1. The notice also included information regarding the proper procedure for requesting a post-termination hearing if Harter believed his termination was the product of unlawful discrimination. *Id.* at 1-3. It informed Harter that failure to seek a review hearing would constitute a failure to exhaust his remedies. *Id.* at 3. Harter ultimately did not seek a post-termination hearing.

The IHRC issued its determination on August 26, 2016, finding Harter could not prevail on his age discrimination claims. However, the IHRC did not consider Harter's termination in reaching this conclusion and made no reference to it. Presumably, its determination was confined solely to allegations made in Harter's complaint filed prior to his termination. On December 21, 2016, Harter filed the lawsuit now before the Court.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

### IV. ANALYSIS

Harter's amended complaint includes the following causes of action: (1) age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"); (2) retaliatory discharge in

violation of Title VII and the ADEA; (3) state law breach of contract and the covenant of good faith and fair dealing; and (4) denial of procedural due process in violation of the Fifth and Fourteenth Amendments of the United States Constitution. The County has moved for summary judgment on all claims.

## A. Age Discrimination Claims

### 1. Applicable Law

It is well established that the "comprehensive remedial scheme of the ADEA demonstrates that Congress intended the ADEA to serve as the exclusive means for pursuing claims of age discrimination in employment." *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1058 (9th Cir. 2009). As such, only Harter's claim of age discrimination under the ADEA is proper, and his claim of age discrimination in violation of Title VII is DISMISSED.

The ADEA makes it "unlawful for an employer . . . to discharge any individual," or otherwise discriminate against an employee because of their age. 29 U.S.C. § 623(a). "To prove discrimination because of age, [Harter] must introduce evidence from which a reasonable jury could conclude, in light of common experience, that it was more likely than not that the employer's adverse action was motivated by consideration of his age." *Maxfield v. Brigham Young Univ.–Idaho*, 27 F. Supp. 3d 1077, 1086 (D. Idaho 2014) (citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80 (1978)). "Age discrimination can be established through either direct or indirect evidence." *Mousaw v. Teton Outfitters*, LLC, No. 4-14-CV-00508-EJL-REB, 2016 WL 5746344, at *4 (D. Idaho Sept. 30, 2016) (citing *Coghlan v. Am. Seafoods Co.*, LLC, 413 F.3d 1090, 1095

(9th Cir. 2005)). However, simply proving age "played a role" in the decision to discharge an employee is not enough; rather, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (holding that mixed-motive theory applicable to Title VII claims is not available in ADEA claims).

The Ninth Circuit utilizes the three-step *McDonnell Douglas* burden-shifting framework to analyze age discrimination cases. *Id.*; *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Under this framework, the employee must first establish a prima facie case of age discrimination. Once the employee has done so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (internal citations omitted).

Plaintiffs can establish a prima facie case based on circumstantial evidence by showing the following: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside of their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)). "The requisite

degree of proof necessary to establish a prima facie case for . . . ADEA claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889; *see also Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) ("As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.").

### 2. Application

The County's memorandum in support of its motion for summary judgment "give[s] Harter the benefit of the doubt" and concedes that he can establish a prima facie case on his ADEA claim. Dkt. 29-1, at 6. As such, the burden shifts to the County to "articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155.

The County has clearly met this burden. Prior to Harter's demotion, the County received multiple complaints about him from his co-workers, including allegations of yelling, verbal abuse, and retaliation against subordinates. An internal investigation corroborated these claims and revealed additional allegations of misconduct—including the statement of a former subordinate who eventually resigned due to Harter's mistreatment of her. Harter himself, although shifting the blame to his co-workers, admitted to raising his voice and cursing at other employees. This internal investigation, which found many of the allegations against Harter to be credible, satisfies the County's burden here.

The burden then shifts back to Harter to "raise a triable issue of material fact as to whether the [County's] proffered reasons for [the adverse employment action are] mere pretext for unlawful discrimination." *Id.* "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004). If the plaintiff proves pretext indirectly, circumstantial evidence of pretext must be "specific and substantial" to survive a motion for summary judgment. *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002).

Harter raises two theories in support of his allegation that the County's stated reasons for his demotion are mere pretext. First, he claims Wilson did not complete a thorough and careful investigation into the complaints raised by Harter's co-workers, and second, he claims the County's failure to promote him to Marshall's vacated position in 2015 is further proof of pretext.

*a. Wilson's Investigation*

In support of his first theory, Harter cites to *Mastro v. Potomac Elec. Power Co.*, 447, F.3d 843 (U.S. App. D.C., 2006), a case that involves a pre-termination investigation. There, the United States Court of Appeals for the District of Columbia denied an employer's motion for summary judgment on a race-based discrimination claim, finding "the investigation . . . lacked the careful, systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and

livelihood depended." *Mastro*, 447 F.3d at 855. The court considered an incomplete, pre-termination investigation such as that to be mere pretext for racial discrimination. *See id.*

The investigation at issue in *Mastro*, however, differed markedly from the investigation here. In *Mastro*, the investigator failed to interview the accused employee before submitting his report to management. *Id.* The court believed this put the employee "on the defensive" when he was finally allowed to share his version of events with management. *Id.* Here, Wilson interviewed Harter prior to submitting his recommendation to the County, providing him with an opportunity to respond to the allegations and to recommend further interviewees.

Additionally, "in conducting an investigation that rested entirely on the question of credibility, [the *Mastro* investigator] eschewed consideration of any indicia of credibility." *Id.* at 856. Instead, the investigator seemed to base "his determination on sheer weight of numbers." *Id.* Here, Wilson not only considered the credibility of the various interviewees, but his report specifically indicated those interviewees he found to be credible and those—including an interviewee adverse to Harter—he believed lacked credibility.

Admittedly, Wilson only interviewed one individual Harter suggested. However, a thorough investigation does not necessarily require that an investigator interview every possible witness. While telling Harter "just selfishly, I don't want to interview a dozen people" may have been a poor choice of words, nothing about Wilson's actual investigation seems improper or cursory. His investigation included interviews with seven individuals, including Harter himself, and a handful of Harter's co-workers—both

current and former. His report to the County detailed the information gleaned from each interview and discussed the credibility of many of the claims made therein. Such an investigation does not raise concerns of incompleteness like those discussed in *Mastro*.

Likewise, nothing in the record "call[s] into question whether [the County's] investigation was a reasonably objective assessment of the circumstances." *Id.* at 857. While Harter claims Wilson, as a County employee, was "not a neutral investigator as required" by the County's 2015 Policy Manual, the manual itself does not define "neutral investigator," nor does Harter provide any persuasive support for the notion that a County employee could not be a neutral party. *Cf. Miller v. Lemhi County*, No. 4-15-CV-00156-EJL-CWD, 2017 WL 2590338, at *15 (D. Idaho June 13, 2017) ("On the one hand, the prosecutor engaged in an investigation. On the other, he served as an agent of the Commissioners for the purpose of advising them on their decision. These facts alone are not sufficient to demonstrate the appearance of or actual bias."). Nothing in the record indicates, nor has Harter established, any improper connection between Wilson and others involved in the Harter investigation.

Harter does, however, allege that by choosing Wilson to investigate the complaints, "the County could hide facts pertaining to the full scope and adequacy of the investigation behind the curtain of attorney-client confidentiality." Dkt. 47, at 3-4. This claim appears to be based on speculation. The County has presented Wilson's entire written report of the investigation (that Wilson provided to the County prior to its decision to demote Harter), and Harter has not shown that he was prejudiced by Wilson's status as an attorney. Such baseless assertions are not enough to satisfy his burden here.

Accordingly, the Court finds that the nature of Wilson's investigation does not support Harter's claims of pretext.

### b. Failure to Promote

Harter next argues that the County's failure to promote him to replace Marshall in 2015 supports an inference of discriminatory motive and serves as further proof of pretext. The County contends that the Court cannot entertain this claim because Harter failed to exhaust his administrative remedies. While the County is not correct in asserting Harter must exhaust his administrative remedies under an ADEA claim, Harter is required to at least file a charge of discrimination with the Equal Employment Opportunity Commission [EEOC] or with an appropriate state agency (in this case, the IHRC). *See Sproul v. Washoe Barton Med. Clinic*, No. 3-10-CV-00801-RCJ-VPC, 2013 WL 1792187, at *11-13 (D. Nev. Apr. 26, 2013) ("Although an ADEA plaintiff need not exhaust administrative remedies as a prerequisite to suit, she must file a charge of discrimination with the EEOC or the equivalent state agency . . .") (citing *Sanchez v. Pac. Power Co.*, 147 F.3d 1097, 1099 (9th Cir.1998)).

Here, Harter filed an age discrimination claim with the IHRC in 2015. However, that claim was primarily based on Harter's demotion without a reduction in pay and made no reference to the County's failure to promote him to Marshall's vacated position. As such, Harter's 2015 IHRC claim would normally not satisfy the requirement that he file a charge of discrimination regarding the County's failure to promote him to Marshall's vacated position in 2015.

However, the Ninth Circuit has explained that "incidents of discrimination not included in an EEOC charge" may still be considered by a federal court if "the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Green v. Los Angeles County Superintendent of Sch.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989) (internal quotation marks omitted). To make this determination, the Court "inquires whether the original EEOC investigation would have encompassed the additional charges." *Id.* Admittedly, these cases involved Title VII claims rather than ADEA claims. However, the Court finds such an approach equally applicable in the ADEA context. *See Williams v. Lorenz*, No. 15-cv-04494-BLF, 2018 WL 4003455 at *6-7 (N.D. Cal. Aug. 22, 2018) (adopting a similar approach).

Here, Harter's failure to promote claim is sufficiently related to the allegations made in his 2015 charge of discrimination filed with the IHRC to allow it to proceed. His actual charge alleged discrimination in the County's decision to demote him, as well as discrimination in the County's hiring of Reynolds—a man younger than Harter—to serve as the County's Alternative Emergency Response Manager, without providing Harter an opportunity to apply for the position. This claim is extremely similar to Harter's allegation of age discrimination in the County's failure to promote him to fill Marshall's position. Because this claim is "like [and] reasonably related to the allegations contained in the [IHRC] charge," the Court may properly consider it now.

The County argues that, even if Harter has satisfied the administrative remedies requirement, he still cannot succeed on this claim because he failed to apply for the position. While a failure to apply normally prevents a claimant from succeeding on a

failure to promote claim, a failure to apply due to discrimination may alleviate that requirement. *See Bouman v. Block*, 940 F.2d 121, 1221 (9th Cir. 1987) (explaining that "a person may have standing in a Title VII action to challenge discriminatory practices even if she did not apply for the position she claims was closed to her because of discrimination."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) ("In unusual circumstances, failure to apply for a position may not vitiate a Title VII action.").

Accordingly, the Court must determine whether discrimination was the cause of Harter's failure to apply for the Director vacancy in 2015. The County's 2013 Policy and Procedure Manual states:

> Vacancies for employment in Bonner County shall be announced by the Human Resource Office in the following manner:
> 1. An email to all employees for internal applications.
> 2. Registration with the Bonner County Office of the Idaho Department of Labor
> 3. Posting on the bulletin board outside the Human Resources Office and on the Bonner County Website.
> 4. Other means deemed necessary regarding filling the position.

Dkt. 29-26, at 13.

The record indicates that Marshall notified the County of her impending retirement several months prior to her departure. While the County claims to have advertised the open position, it remains unclear what that advertisement entailed. Harter claims he never received an email or any other form of *personal* notice regarding an opportunity to apply for the position. However, he does not dispute that the County advertised the position, or that he was aware of Marshall's impending retirement. In fact, Harter admits that he received an email from Marshall regarding her decision to retire.

Ultimately, the Court finds no indication that Harter's failure to apply was caused by discrimination. He was aware of Marshall's impending retirement, and wrongfully assumed Bob Howard would replace Marshall. Despite knowing the position would be vacated, Harter never discussed the possibility of applying with Marshall, Howard, or Human Resources. Harter's lack of diligence appears to be the true cause of his failure to apply for the position, not discrimination by the County. As such, Harter cannot succeed on his failure to promote claim, because he failed—due to his own lack of diligence—to apply for the position.

Accordingly, Harter has not shown that the County's proffered reasons for demoting him are pretext for age discrimination. There is nothing to suggest Wilson's investigation was improper or incomplete, and the County's actions based upon the investigation were reasonable. While Harter's co-workers could have fabricated the complaints against him, that does not mean the County was discriminating against Harter based on his age. The County was required to take the allegations seriously, investigate them, and take action if it found them to be credible. The County did just that. Multiple employees corroborated the allegations, further strengthening their credibility. Additionally, Harter's failure to apply for Marshall's position following her announced retirement prevents him from succeeding on his failure to promote claim. In sum, Harter has not provided specific and substantial circumstantial evidence that the County's decision to demote him, and failure to promote him to Marshall's position were mere pretext for age discrimination. Because Harter has failed to prove the County's proffered

reasons for demotion were pretextual, the County's Motion for Summary Judgment—as it relates to Harter's ADEA claim—is GRANTED.

## B. Retaliation Claims

### 1. Applicable Law

Harter next claims the County's decision to terminate his employment was made in retaliation for his IHRC complaint. He brings this claim under both the ADEA and Title VII. To make out a prima facie case of retaliation under Title VII and the ADEA, Harter must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between his activity and the employment decision. *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (discussing the standard for an ADEA claim); *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2004) (discussing the standard for a Title VII claim). If Harter can make out a prima facie case, then the *McDonnell Douglas* burden shifting scheme applies. *O'Day*, 79 F.3d at 763. The burden shifting scheme, as well as Harter's avenues for showing pretext in a retaliation claim, are no different than as described above under Harter's age discrimination claim. *See Stegall*, 350 F.3d at 1066-67.

### 2. Application

It is undisputed that Harter engaged in a protected activity (filing a charge of discrimination with the IHRC), and that he suffered an adverse employment action (termination). The County disputes that there is a causal link between Harter's IHRC complaint and his termination. Harter has not produced any direct evidence to show a

causal link exists. However, "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

In this area, the Ninth Circuit has rejected "any bright-line rule about the timing of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 978 (2003). Instead, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Id.* Even an "eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Id.* (quoting *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002)).

Here, the County appears to have been aware of Harter's IHRC complaint at the time of his termination. Additionally, while Harter's termination occurred approximately eleventh months after he filed his IHRC claim, the IHRC did not issue its decision until one month after his termination. The record does not include clear evidence of additional misconduct by Harter following his demotion, nor did the County include specific reasons for its decision on Harter's notice of termination. The notice simply informed him that the County was "unsatisfied with [his] performance." Dkt. 29-14.

Despite the lack of direct evidence, the circumstances surrounding his termination (e.g. no clear evidence that Harter failed to perform his job responsibilities or acted inappropriately after his demotion) considered in conjunction with his pending IHRC

claim, create a reasonable inference of causation. As such, the Court finds that Harter has established a prima facie case.

The burden then shifts to the County to articulate a legitimate, non-discriminatory reason for the adverse employment action. The County has failed to meet this burden. While its reasons for demoting Harter and placing him on probation appear legitimate and non-discriminatory, the same cannot be said for its decision to terminate Harter's employment. In fact, the County has said almost nothing regarding its reasons for terminating Harter. While there is "no legal obligation to inform an 'at will' employee of any, or all of, the reasons for termination" (*Mousaw*, 2016 WL 5746344, at *7), the County has also failed to explain its reasons for terminating Harter in its Motion for Summary Judgment and at oral argument.[1]

The County argues that if its decision to terminate Harter was retaliatory, it would have terminated him in 2015—immediately after he filed his IHRC complaint—rather than waiting until nearly one year later. This argument, however, is unconvincing. "[S]ome retaliators prefer to take their time: They may wait until the victim is especially

---

[1] A close search of the record does reveal a complaint regarding Harter that may have been sent to Klinger during Harter's probationary period. While the complaint itself is not dated, it appears to have been faxed to Klingler on April 14, 2016, exactly two months prior to Harter's termination. Dkt. 29-31. Additionally, a "Notice of Verbal Warning from Greg Edwards," apparently given to Harter on April 20, 2016, is mentioned in Harter's Request for Admission #36. Dkt. 49-1, at 5. However, the notice itself does not appear to be in the record. While the County could have perhaps elaborated on these incidents to articulate a legitimate, non-discriminatory reason for terminating Harter during his probationary period, the County never mentioned these documents in its Motion for Summary Judgment, or at oral argument. Instead, the Court is left without any indication as to the legitimacy of the April 14, 2016 complaint, whether the County investigated the complaint, or how serious Harter's alleged misconduct was. The Court cannot even be sure when the complaint was actually written. Without more, merely including the complaint in the record is not enough to satisfy the County's burden here.

vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation. [The Court] should be particularly sensitive to this last point." *Coszlater*, 320 F.3d, at 978.

Because the County has not articulated a legitimate, non-discriminatory reason for Harter's termination, a genuine issue for trial exists, and the County's Motion for Summary Judgment on Harter's retaliation claims is DENIED.

## C. State Law Breach of Contract Claims

Harter's Amended Complaint states, "[Harter] had a valid employment contract with Defendant Bonner County providing . . . that he could only be terminated for 'good cause.'" Dkt. 5, at 12. However, it is unclear whether Harter actually signed an initial employment contract, as no original contract is in the record. Harter's Amended Complaint does state that "Bonner County's personnel rules, policies and procedures constitute an employment contract under Idaho law and, acted as a contract between Plaintiff and Defendant." Dkt. 5, at 4. Presumably, this is the alleged contract at issue here. Harter's Amended Complaint further claims that the County breached this contract, as well as implied covenants of good faith and fair dealing, by terminating him without good cause, and without a post-termination hearing.

However, while Harter's Memorandum in Opposition to Summary Judgment includes a heading that states "Harter's Contract Claims . . . Should Not Be Dismissed" (Dkt. 47, at 15), he did not include any argument in support of these claims in his opposition to the County's Motion for Summary Judgment or at oral argument. Instead,

Harter seems to have conflated his contract claims with his due process claims (discussed below), and as a result, failed to address his contract claims.

Accordingly, Harter has abandoned his contract claims. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2009) (explaining "a plaintiff . . . abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment") (quoting *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)); *Knowles v. Hawai'i Pac. Univ.*, Civ. No. 1600678ACKKSC, 2018 WL 3370520, at *7 (D. Haw. July 10, 2018) ("By failing to make any argument regarding the claim, Plaintiff has abandoned it."). While Harter at least mentioned his contract claims in his response to the County's motion, merely mentioning an issue is insufficient. *Cf. Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) ("Issues raised in a brief which are not supported by argument are deemed abandoned."). As such, there is no genuine issue for trial, and the Court GRANTS the County's Motion for Summary Judgment on Harter's contract claims.

Even if the Court were to assume, *arguendo*, that Harter did not abandon his contract claims, summary judgment would still be proper because these claims appear to be based on a contract that did not exist. Harter states that the "County's personnel rules, policies and procedures constitute an employment contract under Idaho law." Dkt. 5, at 4. The Court disagrees. The Idaho Supreme Court has explained:

> Whether an employee manual constitutes an element of an employment contract is generally a question of fact unless the [manual] specifically negates any intention on the part of the employer to have it become a part of the employment contract. Thus . . . this Court must examine the [Policy and Procedure Manual] together with any written and oral statements made to

[the employee] to determine first, whether they specifically negate any intention of contract formation. If not, this Court must then determine if there is a question of fact as to whether the parties intended the [Policy and Procedure Manual] to express a term of the employment contract.

*Nix v. Elmore County*, 346 P.3d 1045, 1052 (Idaho 2015) (internal punctuation and citations omitted).

Here, the Court need not reach the second part of this inquiry, because the County's Policy and Procedure Manual clearly negates any intention that it become part of, or serve as, an employment contract. Specifically, the 2013 manual states:

> THIS PERSONNEL POLICY IS NOT A CONTRACT. NO CONTRACT OF EMPLOYMENT WITH BONNER COUNTY WILL BE VALID UNLESS IT IS EXPRESSLY APPROVED BY THE BOARD OF COUNTY COMMISSIONERS AND UNLESS IT IS SIGNED BY AND CONTAINS THE NAME OF THE SPECIFIC EMPLOYEE WHO WOULD BE BENEFITED/OBLIGATED BY THE CONTRACT. NOTWITHSTANDING ANYTHING SAID BY A SUPERVISOR, DEPARTMENT HEAD AND/OR ELECTED OFFICIAL, NO CONTRACT OF CONTINUED EMPLOYMENT SHALL BE IMPLIED. . . . THE POLICIES AND BENEFITS OUTLINED IN THIS POLICY MANUAL ARE SUBJECT TO CHANGE AT ANY TIME, WITHOUT PRIOR NOTICE.

Dkt. 29-26, at 2 (emphasis in original).

Harter signed an acknowledgement form on February 19, 2013, indicating that he received the 2013 Policy and Procedure Manual, and that he understood it was "not a contract and cannot create a contract." Dkt. 29-27. Harter signed a similar acknowledgement on May 9, 1998, which stated that the 1998 Policy and Procedure Manual was not a contract of employment. As such, Harter's contract claims appear to be based on a contract that, in fact, did not exist. Accordingly,

even if Harter had not waived these claims, summary judgment would still be
proper.

D. Due Process Claims

Lastly, Harter alleges that the County denied him procedural due process in
violation of the Fifth and Fourteenth Amendments when it demoted him in 2015, and
again when it terminated him in 2016. He brings these claims under 42 U.S.C. §1983. As
an initial matter, "[t]hat the Fifth Amendment applies only to the acts of the federal
government is settled beyond doubt." *Johnston v. Earle*, 245 F.2d 793, 796 n.5 (9th Cir.
1957). As such, only the Fourteenth Amendment applies to Harter's due process claims,
because the County is a political subdivision of the State of Idaho. *See Dusenbery v.
United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth
Amendment prohibits the United States, as the Due Process Clause of the Fourteenth
Amendment prohibits the States, from depriving any person of property without due
process of law.").

*1. The 2015 Demotion*

The County first argues that, because Harter challenges his 2015 demotion as a
product of age discrimination, the ADEA precludes his § 1983 action. It is true, as noted
above, that the "comprehensive remedial scheme of the ADEA demonstrates that
Congress intended the ADEA to serve as the exclusive means for pursuing claims of age
discrimination in employment." *Ahlmeyer*, 555 F.3d at 1058. Accordingly, the Ninth
Circuit has found that the ADEA "should be read as precluding § 1983 actions in the area

of age discrimination in employment. . . . even those claims with their source in the Constitution." *Id.* at 1060-61.

Despite the broad language of *Ahlmeyer*, the County's reading of the decision is overbroad. In a subsequent decision, the Ninth Circuit provided a narrower view and explained that *Ahlmeyer* "held that the ADEA precludes § 1983 suits to remedy equal protection violations based on age." *Stilwell v. City of Williams*, 831 F.3d 1234, 1251-52 (9th Cir. 2016) The Court then rejected an argument that the ADEA precludes First Amendment retaliation claims and remanded the case so the lower court could hear those claims. *Id.*

Here, like in *Stilwell*, Harter is not bringing an equal protection claim under § 1983. He simply claims that he was entitled to due process prior to his demotion, which the County refused to provide. When considered in this light, it is evident that Harter's due process claim has nothing to do with his age, and therefore, the ADEA does not preclude him from bringing it under § 1983.

Next, the County argues that, even if the ADEA does not preclude Harter's demotion-related due process claim, it still fails because Harter was not entitled to a hearing following his demotion. The Court agrees.

A § 1983 claim based upon procedural due process contains three elements: (1) a liberty or property interest protected by the United States Constitution; (2) a deprivation of that interest by the government; and (3) a denial of adequate procedural protections. *See Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). "While state law establishes the parameters of an individual's substantive interest, federal law is what

determines if that interest is a protected property right." *Hollist v. Madison Cty.*, No. 4:13–cv–00139–BLW, 2014 WL 5089941, at *4 (D. Idaho Oct. 9, 2014) (citing *Lawson v. Umatilla Cty.*, 139 F.3d 690, 692 (9th Cir.1998)). "Under the federal constitution, at-will employees possess no protected property rights and therefore are not entitled to due process before being terminated." *Lawson*, 139 F.3d at 691-92.

"Employment in Idaho is presumed to be at-will unless the employee is hired pursuant to a contract that states a fixed term or limits the reasons for discharge." *Nix*, 346 P.3d, at 1052 (internal citation omitted). In the absence of such limitations, "either party may terminate [the employment relationship] at any time or for any reason without incurring liability." *Id.* (internal citation omitted). Presumably, if—absent an agreement to the contrary—an employer can terminate an employee for any reason, an employer can also demote an employee for any reason.

Here, the County concedes that it entered into an agreement with Harter that limited its right to terminate his employment. Section 500.1 of the County's Policy and Procedure Manual states, "[e]xcept as otherwise provided in this policy, regular employees of Bonner County will not be suspended without pay, demoted *with an accompanying change in pay*, or discharged from their positions for disciplinary purposes except for cause related to performance of their job duties or other violations of this policy." (emphasis added). While this policy limits the County's ability to demote Harter

*with* an accompanying change in pay, it does not limit the County's ability to demote

Harter *without* an accompanying change in pay.[2]

Admittedly, this discussion may seem to conflict with the Court's above finding

that the County's Policy and Procedure Manual did not constitute an employment

contract with Harter. Indeed, one might be left to wonder how a manual that does not

constitute a contract can simultaneously limit the County's ability to terminate or demote

an employee. The Idaho Supreme Court's decision in *Bollinger v. Fall River Rural Elec.*

*Co-op., Inc.*, 272 P.3d 1263, 1269 (Idaho 2012), provides clarity. There, the Idaho

Supreme Court explained:

> In the absence of an express contract, a limitation to the at-will employment
> presumption may be implied where the circumstances surrounding the
> employment relationship could cause a reasonable person to conclude that
> the parties intended a limitation on discharge. Statements made and policies
> promulgated by the employer, whether in an employment manual or
> otherwise, may give rise to such an implied-in-fact agreement.

Id. at 1269 (internal citations omitted).

That is clearly the case here. While the County's Policy and Procedure Manual is

not a contract, its provisions (in place at the time Harter was demoted) would cause a

reasonable person to conclude that the parties intended to limit the County's power to

discharge an employee, as well as its power to demote an employee *with* an

---

[2] In his response to the County's Motion for Summary Judgment, Harter argues that his pay was, in fact, reduced as a result of the demotion, because his opportunities to work overtime diminished. However, such an argument is clearly inconsistent with Harter's previous statements, in which he explained that his opportunities for overtime were "cut to zero" sometime around 2012—years before the County demoted him. *See* Dkt. 29-17, at 2; Dkt. 29-18, at 7-8, 27-28.

accompanying change in pay. The Manual's language does not, however, include any indication that that the parties intended to limit the County's power to demote an employee *without* an accompanying change in pay. As such, the implied-in-fact agreement extended no protection to demotions without an accompanying change in pay.

Accordingly, the County's decision to demote Harter without an accompanying change in pay did not infringe upon a protected property interest, and Harter was not entitled to due process following such a demotion. The Court therefore GRANTS the County's Motion for Summary Judgment on this claim.

## 2. *The 2016 Termination*

That leaves only Harter's due process claim as it relates to his termination. Pursuant to the County's Policy and Procedure Manual, employees terminated during their probationary period are entitled to an opportunity to be heard under the County's Unlawful Discrimination and Name-Clearing Policy.[3]

The County argues that, because Harter elected to forego the post-termination hearing it offered, he cannot now claim that the County deprived him of due process. The Ninth Circuit has held that "where adequate administrative procedures exist, a person cannot state a claim for denial of procedural rights when he has elected to forego a complete hearing." *Correa v. Nampa School Dist. No. 131*, 645 F.2d 814, 817 (1981). Another case arising out of this District recently reached the same conclusion. *See Miller*,

---

[3] Although the parties disagree over whether Harter was a for-cause or at-will employee during his probation, this issue is of little consequence here because the County's Policy and Procedure Manual offered Harter a hearing following his termination regardless.

2017 WL 2590338, at *14 ("[T]he County's failure to conduct a post termination hearing does not constitute a failure of due process because Plaintiff did not request one.") Here, the County not only informed Harter that he could request a hearing, but also advised him that failure to do so would constitute a failure to exhaust his remedies under the County's Policy and Procedure Manual.

However, even though procedural due process rights may be waived, "'[c]ourts indulge every presumption against the waiver of fundamental constitutional rights.'" *Byers v. New Plymouth School Dist. No. 372*, No. 1:12–CV–00230–EJL, 2013 WL 5943938, at *10 (D. Idaho Nov. 5, 2013) (quoting *Pitts v. Board of Education of School Dist. 205*, 869 F.2d 555, 557 (10th Cir. 1989) (citation omitted). Whether due process rights have been waived "depends upon the facts of a particular case," and waiver is valid only "if it is done in an informed manner." *Pitts*, 869 F.2d at 557 (citing *Johnson v. U.S. Dep't of Agriculture*, 734 F.2d 774, 784 (11th Cir. 1984)). Additionally, a plaintiff may waive due process rights by electing to forego a hearing only if the suggested hearing would have been adequate. *See Bignall v. North Idaho College*, 538 F.2d 243, 247 (9th Cir. 1976). Harter has claimed that he elected to forego the post-termination hearing because it would have been futile. He explained:

> Ultimately after discussion with counsel I decided that pursuit of a post termination hearing was futile. I based this on circumstances surrounding the prior in time pre-demotion investigation hearing which wasn't fair as so few [Solid Waste Department] employees were interviewed. This led me to believe that due to prejudgment a post termination hearing would have the same result. I didn't want any more negative notes to go in to my employment file.

Dkt. 37-1, at 6.

The Court struggles to understand why Wilson's investigation would affect Harter's perception of the post-termination hearing available to him. As discussed above, the Court does not consider Wilson's investigation improper or cursory, and that investigation provided Harter with an extended opportunity to respond to the specific allegations leveled against him.

That said, the Court must indulge every presumption against the waiver of constitutional rights. Here, even though Harter has not provided the Court with specific facts to support an argument that a post-termination hearing would have been inadequate, certain circumstances in this case give rise to presumptions that support such a position. Foremost among these is the County's failure to specify why it chose to ultimately terminate Harter. If, as Harter claims, the County made that decision in retaliation for Harter's IHRC complaint, then Harter's belief that a post-termination hearing would have been futile due to "prejudgment" is reasonable. Because a genuine issue for trial exists regarding whether the County had a legitimate, non-discriminatory reason for Harter's termination, it follows, then, that a genuine issue for trial exists as to whether the County's post-termination hearing would have been adequate. Accordingly, the Court DENIES the County's Motion for Summary Judgment as it relates to this claim.

## V. ORDER

THE COURT HEREBY ORDERS:

1. The County's Motion for Summary Judgment (Dkt. 29) is GRANTED IN PART and DENIED IN PART consistent with the above analysis, and as set forth below:

   a) Harter's claim of age discrimination in violation of Title VII is DISMISSED.

b) The County's Motion for Summary Judgment on Harter's claim of age discrimination in violation of the ADEA is GRANTED.

c) The County's Motion for Summary Judgment on Harter's claim of retaliatory discharge in violation of Title VII and the ADEA is DENIED.

d) The County's Motion for Summary Judgment on Harter's state law breach of contract and covenant of good faith and fair dealing claim is GRANTED.

e) The County's Motion for Summary Judgment on Harter's Due Process claim stemming from his 2015 demotion is GRANTED.

f) The County's Motion for Summary Judgment on Harter's Due Process claim stemming from his 2016 termination is DENIED.

DATED: October 2, 2018

David C. Nye
U.S. District Court Judge